In re John R. McALLISTER, Debtor.

HOC, INC., Plaintiff,

v.

**John R. McALLISTER, Defendant.**

**Bankruptcy No. 95–03468–BGC–7. Adversary No. 95–00419.**

United States Bankruptcy Court, N.D. Alabama, Southern Division.

Sept. 17, 1996.

See also 211 B.R. 976.

Wayne Wheeler, Birmingham, AL, for Plaintiff.

Leo Costello, Birmingham, AL, for Defendant.

## MEMORANDUM OPINION ON OBJECTION TO DISCHARGE AND COMPLAINT TO ESTABLISH NON–DISCHARGEABILITY OF DEBT

### (Motion for Summary Judgment filed by the Defendant)

BENJAMIN COHEN, Bankruptcy Judge.

The matter subject to this Memorandum Opinion and accompanying Order is a *Motion for Summary Judgment* filed by John R. McAllister. A hearing was held on February 21, 1996. Wayne Wheeler, the attorney for the plaintiff, and Leo E. Costello, the attorney for the debtor, appeared. The matter was submitted on the record in the case; excerpts from the deposition of Mr. George Gould, the plaintiff's representative, with exhibits attached; the deposition of Mr. John R. McAllister; numerous exhibits offered by the parties; and the arguments and briefs of counsel.[1] The debtor insists that there are

---

1. In support of his summary judgment motion, the debtor directed the Court's attention to: the plaintiff's complaint; the debtor's answer to the complaint; excerpts from the discovery deposition of Mr. George Gould; the ledger sheet attached to and referred to in the excerpt of Mr. Gould's deposition; excerpts from the discovery deposition of Mr. McAllister; two written agreements that were attached to and referred to in Mr. McAllister's discovery deposition; an affida-

no genuine issues as to the material facts involved in this case.

## I. SUMMARY JUDGMENT FRAMEWORK

In *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993) the Court of Appeals for the Eleventh Circuit explained the framework for deciding a summary judgment motion. Writing for the Court, Judge R. Lanier Anderson, III stated:

### A. Introduction

Under Fed.R.Civ.P. 56(c), a moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "The district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his [or her] favor." *U.S. v. Four Parcels of Real Property,* 941 F.2d 1428, 1437 (11th Cir.1991)(en banc)(internal quotation marks and citations omitted).

In *Adickes v. [S.H.] Kress [& Co.],* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), the Supreme Court instructed the federal courts to employ a two-part framework of shifting burdens to determine whether, as regards a given material fact, there exists a genuine issue precluding summary judgment. The operation of this framework was modified significantly *in*

*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The current framework is set out below.

### B. Movant's Initial Burden

The movant's initial burden consists of a "responsibility [to] inform [ ] the ... court of the basis for its motion and [to] identify those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. at 2553. The nature of this responsibility varies, however, depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or the non-movant would bear the burden of proof at trial.

### 1. For Issues on Which Movant Would Bear Burden of Proof at Trial

As interpreted by this court sitting en banc, Celotex requires that for issues on which the movant would bear the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, come[s] forward with significant, probative evidence demonstrating

---

vit and summary prepared by a legal assistant who works for Mr. Costello, the debtor's attorney; and a memorandum of argument and law and "Statement of Undisputed Facts" prepared by Mr. Costello. The Court did not consider an affidavit and summary prepared by Mr. Costello's legal assistant and submitted by the Debtor. The affiant is neither a party to this proceeding nor a witness to facts relevant to the issues before the Court. She apparently has no personal knowledge of the facts and records from which she prepared her affidavit and summary and is therefore incompetent to testify regarding the

matters contained therein. Federal Rule of Civil Procedure 56(e) requires that "[s]upporting affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

In opposition to the debtor's summary judgment motion, the plaintiff directed the Court's attention to the debtor's deposition testimony and the testimony given by the debtor at his first meeting of creditors held on July 20, 1995.

the existence of a triable issue of fact. *Four Parcels*, 941 F.2d at 1438 (citations and internal quotation marks omitted; emphasis in original).

### 2. For Issues on Which Non–Movant Would Bear Burden of Proof at Trial

For issues, however, on which the non-movant would bear the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim in order to discharge this initial responsibility. Instead, the moving party simply may show [ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial. *Four Parcels*, 941 F.2d at 1437–38 (citations, footnote, and internal quotation marks omitted; emphasis in original).

### C. Non–Movant's Responsibility Once Movant Satisfies Initial Burden

If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made. [*Clark v.*] *Coats & Clark*, 929 F.2d [604] at 608 [(11th Cir.1991)]. If, however, the movant carries the initial summary judgment burden in one of the ways discussed above, responsibility then devolves upon the non-movant to show the existence of a genuine issue as to the material fact.

### 1. For Issues on Which Movant Would Bear Burden of Proof at Trial

For issues on which the movant would bear the burden of proof at trial, the non-movant, in order to avoid summary judgment, must come forward with evidence sufficient to call into question the inference created by the movant's evidence on the particular material fact. Only if after introduction of the non-movant's evidence, the combined body of evidence presented by the two parties relevant to the material fact is still such that the movant would be entitled to a directed verdict at trial—that is, such that no reasonable jury could find for the non-movant—should the movant be permitted to prevail without a full trial on the issues. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511.

### 2. For Issues on Which Non–Movant Would Bear Burden of Proof at Trial

For issues on which the non-movant would bear the burden of proof at trial, the means of rebuttal available to the non-movant vary depending on whether the movant put on evidence affirmatively negating the material fact or instead demonstrated an absence of evidence on the issue. Where the movant did the former, then the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated. Where the movant did the latter, the non-movant must respond in one of two ways. First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was "overlooked or ignored" by the moving party, who has thus failed to meet, the initial burden of showing an absence of evidence. *Celotex*, 477 U.S. at 332, 106 S.Ct. at 2557 (Brennan, J., dissenting). Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. See Melissa L. Nelkin, *One Step Forward, Two Steps Back: Summary Judgment After Celotex*, 40 Hastings L.J. 53, 82–83 (1988).

*Fitzpatrick*, 2 F.3d at 111 5–1117 (footnotes omitted).

## II. UNDISPUTED OR UNCONTROVERTED FACTS

From September 1992 through the middle of 1994, the debtor and the plaintiff operated under a contract regarding the purchase and sale of used automobiles. Pursuant to that

contract, the plaintiff advanced funds to the debtor for use by the debtor for the wholesale purchase of used automobiles. After the purchase of an automobile, the debtor was required under the contract to deliver the automobile's title to the plaintiff. The debtor would then endeavor to resell the automobile for a profit. When the debtor sold an automobile, he was required to reimburse the plaintiff, from the sale proceeds, the amount advanced by the plaintiff that allowed the wholesale purchase of the automobile. On reimbursement by the debtor from the proceeds of the sale of an automobile, the plaintiff was required to deliver the automobile's title to the debtor who, in turn, was to deliver the title to the retail purchaser.

The debtor was also required under the contract to pay a specified sum each month to the plaintiff in lieu of interest on the unpaid principle balance of cumulative unreimbursed funds advanced to the debtor. Over the course of their dealings, the unpaid principle balance of funds advanced to the debtor was as high as $150,000 and the monthly payment required of the debtor ranged from a low of $3,600 to a high of $4,800.

Until January 1, 1994, the contract between the debtor and the plaintiff was oral. On that date, the debtor, at the plaintiff's behest, signed a document which purports to embody the terms of the oral contract and to grant the plaintiff a security interest in automobiles purchased by the debtor from funds advanced by the plaintiff.[2]

The controversy in this case centers around eight automobiles. Each of the automobiles was purchased by the debtor with funds advanced by the plaintiff. The plaintiff alleges that the automobiles were sold by the debtor to third parties but that the debtor did not reimburse the plaintiff from the sales proceeds, as required by the contract, for the funds advanced to purchase those eight automobiles. The debtor freely admits that he sold six of the eight automobiles and did not reimburse the plaintiff from the proceeds of the sales. The debtor admits also that he did not deliver the titles to four of those six automobiles to the plaintiff when he purchased them at wholesale, also as is required under the contract. The debtor does allege, however, that he reimbursed the plaintiff for one of the automobiles in question and that he sold another automobile to an employee pursuant to an oral installment purchase contract but that the employee paid no portion of the purchase price. The debtor represents that the employee claims that the car was stolen and was wrecked.

At least five of the eight cars in question were sold by the debtor after January 1, 1994, the date the written memorandum was signed by the debtor. Only two of those cars were purchased by the debtor from funds advanced by the plaintiff after that same date.

The following is a description of each automobile in question as well as a synopsis of the debtor's deposition testimony and interrogatory answers regarding each automobile:

1. 1990 Jaguar XKS—The debtor purchased the Jaguar at an automobile auction. When he received the title to the Jaguar from the auction he did not deliver that title to the plaintiff as required by the contract. The debtor sold the Jaguar for $20,000 on March 10, 1994 and delivered the title directly to the purchaser. He did not inform the plaintiff that the car had been sold and did not reimburse the plaintiff from the proceeds.

2. 1993 Cadillac DeVille—The debtor purchased the Cadillac at an automobile auction. When the debtor received the title to the Cadillac from the auction he did not deliver that title to the plaintiff as required by the contract. The debtor sold the vehicle on February 23, 1994 for $21,200 and delivered the title directly to the purchaser. He did not inform the plaintiff that the car had been sold and did not reimburse the plaintiff from the proceeds.

---

**2.** A copy of the document is an exhibit to the Deposition of John R. McAllister which is attached to plaintiff's *Response to Motion for Sanctions.* The Motion for Sanctions along with a Motion for Rule 11 Sanctions are pending before the Court. Those matters will be addressed separately at a later date.

3. 1978 Mercedes Roadster—The debtor sold the Mercedes on June 13, 1994 for approximately $9,000. The debtor did not inform the plaintiff that he had sold the car. He did not obtain the certificate of title to the car from the plaintiff before transferring the vehicle to the customer and did not reimburse the plaintiff from the proceeds.

4. 1970 Oldsmobile 442—The debtor sold the Oldsmobile on February 11, 1994 for $9,000. The debtor did not inform the plaintiff that the car had been sold. He did not obtain the bill of sale from the plaintiff before he transferred the vehicle (the automobile was not a "titled" vehicle) and did not reimburse the plaintiff from the proceeds.

5. 1992 Crown Victoria LX—The debtor purchased the Crown Victoria at an automobile auction. When the debtor received the title to the Crown Victoria from the auction he did not deliver that title to the plaintiff as required by the contract. The debtor sold the Crown Victoria on February 23, 1994 for $12,450 and delivered the title directly to the purchaser. He did not inform the plaintiff that the car had been sold and did not reimburse the plaintiff from the proceeds.

6. 1991 BMW 325i—The debtor purchased the BMW at an automobile auction. When he received the title to the BMW from the auction he did not deliver that title to the plaintiff as required by the contract. The debtor sold the BMW for $15,000 on December 27, 1993 and delivered the title directly to the purchaser. He did not inform the plaintiff that the car had been sold and did not reimburse the plaintiff from the proceeds.

7. 1985 Subaru—The debtor claims that he paid the plaintiff $3,000 for the Subaru, which was the amount advanced to him by the plaintiff for it's purchase, and that he obtained the title to the Subaru from the plaintiff.

8. 1984 Volkswagen—The debtor sold the Volkswagen, pursuant to an unsecured verbal installment sale contract, to one of his employees. The employee was to pay $2,000 for the car which was to be deducted over time from the employee's pay checks. The employee claimed that the car was stolen from his home and wrecked. The employee never paid any portion of the purchase price. The debtor did not obtain the title from plaintiff before he transferred the vehicle.

### III. CONTENTIONS AND LEGAL THEORIES REGARDING FRAUD, EMBEZZLEMENT AND CONVERSION

The plaintiff contends that the debtor's failure to deliver titles and to reimburse the plaintiff from sales proceeds as required by the contract constitutes fraud, embezzlement and the willful and malicious conversion of its interests in the automobiles sold, as well as the proceeds of those automobiles, and that the debt created thereby is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(4) and (6).[3] The debtor's motion for summary judgment is based *solely* on the contention that the agreement between the debtor and plaintiff was oral rather than in writing (contending that a writing is required by Ala.Code 1975, § 7–9–203(1)(a)), and that the plaintiff, consequently, had no valid security interest in either the automobiles or their proceeds and that no interest in either the automobiles or their proceeds could have been embezzled or converted by the debtor.

#### A. The Applicable Statute: Ala.Code 1975, § 7–9–203(1)(a)

Section 7–9–203(1)(a) of the Alabama Code provides that a security interest is not enforceable against a debtor or third parties with respect to collateral unless "the debtor has signed a security agreement which contains a description of the collateral...." Ala.Code 1975, § 7–9–203(1)(a). The often quoted "Official Comments" to that code section explain that the section is in the nature of a statute of frauds, so that an oral security agreement ordinarily accords the secured

---

**3.** In both *Ford Motor Credit Co. v. Owens*, 807 F.2d 1556, 1559 (11th Cir.1987) and *Chrysler Credit Corp. v. Rebhan*, 842 F.2d 1257, 1264 (11th Cir.1988), the Eleventh Circuit Court of Appeals affirmed the decision of a lower court which held that a car dealer who obtained cars with money advanced by a secured creditor and disposed of the cars without remitting the proceeds of the car sales to the secured creditor in contravention of a floor plan security agreement was guilty of a willful and malicious conversion of the secured creditor's interest in the cars.

party no right to take possession of collateral or have the collateral sold to satisfy the debt:

> The formal requisite of a writing stated in this section is not only a condition to the enforceability of a security interest against third parties, it is in the nature of a Statute of Frauds. Unless the secured party is in possession of the collateral, his security interest, absent a writing, which satisfies paragraph (1)(a), is not enforceable even against the debtor, and cannot be made so on any theory of equitable mortgage or the like. If he has advanced money, he is of course a creditor and, like any creditor, is entitled after judgment to appropriate process to enforce his claim against his debtor's assets; he will not, however, have against his debtor the rights given a secured party by Part 5 of this Article on default.

Official Comments to Ala.Code 1975, § 7–9–203(1)(a), paragraph 5.

### B. The Written Agreement

■ The agreement signed by the debtor on January 1, 1994, satisfies the requirements of Ala.Code 1975, § 7–9–203(1)(a). The document explicitly uses the term "security agreement" with respect to any automobiles purchased by the debtor with funds advanced by the plaintiff and gives the plaintiff rights to inspect the automobiles and to take possession and sell the automobiles to satisfy debts owed under the contract in the event of the debtor's default. The use of generic terms "automobiles" and "vehicles", coupled with language which clearly indicates that the "automobiles" and "vehicles" re-

ferred to are those purchased by the debtor with funds advanced by the plaintiff, meets the "description of the collateral" requirement of 7–9–203(1)(a) and was sufficient to create a security interest in any particular car purchased by debtor with the plaintiff's money.[4]

### C. Cars Purchased and Sold After January 1, 1994: The Cadillac and Jaguar

■ According to the deposition testimony of the plaintiff's representative Mr. George Gould, only the Jaguar and the Cadillac were purchased from funds advanced by the plaintiff after January 1, 1994. Since a valid written security agreement was signed by the debtor on January 1, 1994, the point raised by the debtor regarding the enforceability of the oral agreement between the parties is not germane to the Cadillac and the Jaguar and as the debtor's motion is based solely on the contention that the parties' agreement was oral rather than written, *summary judgment must be denied to the extent that the plaintiff's complaint is based on the debtor's sale of those automobiles, automobiles purchased from funds advanced by the plaintiff after January 1, 1994.*

### D. Cars Purchased Before January 1, 1994 and Sold After January 1, 1994: The Mercedes, Oldsmobile and Crown Victoria

■ *Summary judgment must also be denied to the extent that the plaintiff's complaint is based on the debtor's sale, after*

---

4. *Coseo v. Alpena Savings Bank,* 612 F.2d 276, 277 (6th Cir.1980)(description of collateral in security agreement between bank and automobile dealer as "all inventory financed through these transactions," was sufficient to create security interest in individual vehicles); *Chicago Limousine Serv., Inc. v. Hartigan Cadillac, Inc.,* 191 Ill.App.3d 886, 139 Ill.Dec. 1, 6, 548 N.E.2d 386, 391 (1989)(words in security agreement relating to new and used vehicles held for sale or lease, "all vehicles of like kinds or types now owned or hereafter acquired," and "all additions and accessions thereto and all proceeds of such vehicles," adequately described automobile inventory financed by secured party), *rev'd on other grounds,* 139 Ill.2d 216, 151 Ill.Dec. 342, 564 N.E.2d 797 (1990); *Villa v. Alvarado State Bank,* 611 S.W.2d 483 (Tex.Civ.App.1981)(description

of collateral in security agreement as "All motor vehicles purchased from time to time by Debtor with proceeds of funds advanced by Bank. Such vehicles shall be inventory in hands of Debtor." was sufficient to create security interest in any particular "motor vehicle" acquired or "purchased" by the debtor).

A description of personal property in a security agreement is sufficient "whether or not it is specific if it reasonably identifies what is described." Ala.Code 1975, § 7–9–110. *See Galleon Indus. Inc. v. Lewyn Mach. Co.,* 50 Ala.App. 334, 279 So.2d 137, 141 (1973)(description of collateral in security agreement as "equipment" was sufficient to create security interest in individual machine), *cert. den.,* 291 Ala. 779, 279 So.2d 142 (1973).

*January 1, 1994, of automobiles purchased by the debtor with funds advanced by the plaintiff before January 1, 1994* because the parties' *written* agreement encompasses those automobiles. Under the applicable portions of. Ala.Code 1975, § 7–9–203(1), a security agreement. is enforceable if (a) the debtor has signed a written security agreement, (b) value has been given by the secured party for the security interest and (c) the debtor has acquired rights in the collateral. Section 7–1–201(44)(b) of the Alabama Code provides that a person gives "value" for rights if he or she acquires them "[a]s security for or in total or partial satisfaction of a preexisting claim." The debtor was, therefore, free to grant a valid security interest on January 1, 1994 to secure advances made by the plaintiff before that date. If the January 1, 1994 agreement was intended, in part, to accomplish that purpose, then the writing requirement of 7–9–203(1)(a) has been satisfied.

█ Both the language of the security agreement and the debtor's deposition testimony strongly indicate that the agreement was intended not only to govern future business relations between the parties, but also to affirm and memorialize the agreement between the parties as to automobiles then in the debtor's possession. The agreement was prepared by the plaintiff in the form of a letter to the debtor. In the first sentence, the agreement is referred to as an "Agreement with [the debtor] in writing pertaining to the *pending operation* involving the financing of automobiles for [the debtor]." The terms of the document appear to be identical to the oral agreement between the parties. In his deposition, the debtor identified the written agreement, and was asked the following question: "And at the time that you transferred these cars did you have knowledge or did you understand and recognize the terms and conditions of your agreement with [the plaintiff]?" The phrase "these cars" was used generally to describe all six of the cars which the debtor admits to having sold without reimbursing the plaintiff. In response to the question, the debtor answered "Yes," without distinguishing between the automobiles purchased before the agreement was signed and those purchased after the agreement was signed. Neither did the debtor suggest that automobiles purchased before he signed the agreement were not intended to be covered by the agreement or that the agreement was only intended to cover automobiles subsequently purchased by him with the plaintiff's money. *A material question of fact, therefore, remains as to whether the security agreement was intended to grant a security interest in automobiles in the possession of the debtor on January 1, 1994 to secure advances made by the plaintiff before that date.*

### E. Cars Purchased Before January 1, 1994 and Sold Before January 1, 1994: The BMW

█ *Summary judgment must also be denied with regards to automobiles sold by the debtor before January 1, 1994.* That category may include only the 1991 BMW 325i that was sold by the debtor on or around December 27, 1993, five days before the debtor signed the written security agreement. While section 7–9–203(1)(a) requires a security agreement to be in writing, it does not specify when the writing must be executed. When an issue is not specifically addressed by a provision of the Uniform Commercial Code, Section 7–1–103 of the Alabama Code contemplates that the issue will be decided in accordance with principles of common law and equity. "Unless displaced by the particular provisions of this title, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating and invalidating cause shall supplement its provisions." Ala.Code 1975, § 7–1–103. Under the common law of this state, as well as many other states, a writing signed subsequent to an oral agreement, which memorializes the terms of the oral agreement, satisfies the Statute of Frauds.[5] "The object

5. *Weitnauer Trading Co., Ltd., v. Annis,* 516 F.2d 878, 880 (2nd Cir.1975)(interpreting New York law); *Busler v. D. & H. Manufacturing, Inc.,* 81 Ohio App.3d 385, 611 N.E.2d 352, 355 (1992); *Lonnie Hayes & Sons Staves, Inc. v. Bourbon Cooperage Co.,* 777 S.W.2d 940, 942 (Ky.App.

of the statute of frauds is to protect individuals from having parol agreements imposed on them against their consent; but it has been uniformly held not to defeat a parol contract which is afterwards evidenced by a writing signed by the party sought to be charged with it." *Levy v. Allen*, 257 Ala. 326, 331, 58 So.2d 617, 622 (1951). The purpose of the statute of frauds is evidentiary. *Id.* All contracts are essentially oral; the writing is only a memorial of the oral contract designed to prevent future dispute regarding what was agreed upon. Therefore, a writing signed by a party subsequent to entering into a oral contract which acknowledges the existence and terms of the oral contract, is equally sufficient to prove the existence and terms of the contract as is a writing signed contemporaneously with the oral contract. As stated by the Alabama Supreme Court:

> The object of the statute of frauds is to protect individuals from having parol agreements imposed on them against their consent; but it has been uniformly held not to defeat a parol contract which is afterwards evidenced by a writing signed by the party sought to be charged with it. It was said in *Jenkins v. Harrison,* supra: The purpose and object of the statute being no more than the requisition of written evidence of the substance of the contract, signed by the party to be charged, so that he may not be subjected to the mischief which could follow from mere oral evidence; the purpose and object, and the words of the statute, are all satisfied, whenever there exists, under the hand of the party sought to be charged, a written statement, containing, either expressly, or by necessary inference, all the terms of the agreement—that is to say, the names of the parties, the subject-matter of the contract, the consideration, and the promise, and leaving nothing open to future treaty. This, therefore, is sufficient to satisfy the statute; and provided this be found, no formality is required; nor does it signify at all what is the nature or character of the document containing such written statement—whether it be a letter written by the party to be charged to the person with whom he contracted, or to any other person, or a deed, or other legal instrument, or an answer to a bill, or an affidavit in chancery, in bankruptcy, or in lunacy.
>
> After a contract has passed beyond negotiation or treaty—after the minds of the parties have met—after there has been reciprocal assent to all its terms—unless all the negotiations have been conducted in writing, there is, of necessity, a period of time, longer or shorter, when it rests wholly in parol—the period intervening between the conclusion of treaty, the mutual assent of the parties, and the reduction of the terms of the contract to writing. The writing is not the contract—it is no more or less than the evidence of it, which must exist, or the contract is without legal validity or efficiency, and this evidence may be supplied at any time after the contract is completed.

*Levy v. Allen,* 257 Ala. at 331–332, 58 So.2d at 622 (citations and internal quotation marks omitted).

 Likewise, the avowed purpose of the writing requirement of 7–9–203(1)(a) is "evidentiary." Official Comments to Ala.Code 1975, § 7–9–203(1)(a), paragraph 3. "The requirement of written record minimizes the possibility of future dispute as to the terms of a security agreement and as to what property stands as collateral for the obligation secured." *Id.* Therefore, a written security agreement signed by the debtor in this case subsequent to creating an oral security agreement, which embodies the terms of the oral security agreement, fully serves the evidentiary purpose of 7–9–203(1)(a) and avoids the evils sought to be avoided by that statute. Accordingly, if the January 1, 1994 contract evinces the oral agreement between the parties regarding the BMW as it existed when the BMW was sold, then the writing require-

---

1989); *Joiner v. Elrod,* 716 S.W.2d 606, 609 (Tex.App.1986); *Johnson v. Ogle,* 120 Mont. 176, 181 P.2d 789, 791 (1947); *Gordon v. Beck & Gregg Hardware Co.,* 74 Ga.App. 566, 40 S.E.2d 428, 432 (1946).

"A memorandum sufficient to satisfy the Statute may be made or signed at any time before or after the formation of the contract." *Restatement (Second) of Contracts* § 136 (1981).

ment of 7–9–203(1)(a) will have been satisfied. The bare assertion by the debtor that, when the BMW was sold, the parties were operating pursuant to an oral security agreement does not preclude a finding that, as to the BMW, the January 1, 1994 contract satisfies the writing requirement of 7–9–203(1)(a). *The debtor has, therefore, failed to show that there remains no material issue of fact as to the BMW.*

### F. The Subaru

■■■] As indicated before, the debtor alleges that he paid the plaintiff for the Subaru. The copy of the plaintiff's ledger sheet that is attached to Mr. Gould's discovery deposition, upon which the plaintiff recorded details of transactions with the debtor, indicates otherwise. *Therefore, there remain material issues of fact as to whether the debtor has paid the plaintiff for the Subaru and, if not, whether the Subaru is covered by the parties' written security interest.*

### G. The Volkswagen

■■■] *Material issues of fact remain as to whether or not the Volkswagen is covered by the parties' written security interest* and, if so, whether the purported unsecured, installment "sale" of the automobile was contemplated or authorized under the parties' agreement.

### IV. FALSE OATH ALLEGATIONS

#### A. Paragraph Five of the Original Complaint

In the original complaint, the plaintiff alleged that the debtor testified falsely at his 11 U.S.C. § 341 first meeting of creditors. Specifically, according to paragraph 5 of the complaint, the debtor stated "that he sold all of the Plaintiff's cars with valid titles." The plaintiff contends that the debtor's statement is untrue.

In his answer to the plaintiff's complaint, the debtor stated:

Defendant admits testifying at the 341 Hearing under oath. However, Defendant denies that anything he said was untruthful. Defendant believed at the time of his testimony, and still believes today, that the

automobiles about which he was questioned, were sold with valid titles. Defendant denies that the automobiles were "Plaintiff's" cars. On the contrary, Defendant asserts that the automobiles were placed in Defendant's possession to be sold to the general public. Upon sell to the general public, the automobiles belonged to the purchaser.

*Answer,* paragraph 6.

The transcript of the testimony given by the debtor at the section 341 meeting, a copy of which is attached to the plaintiff's *Response to Summary Judgment,* shows the following exchange between the debtor and the plaintiff's attorney:

Q. What has happened to the cars that were purchased with monies belonging to HOC, Inc.?

A. The cars have been sold.

Q. And did you furnish a title to these cars to the purchasers?

A. I have to a majority of the cars. I think there's one or two cars that don't have titles.

Q. How did you obtain the title to these vehicles?

A. I got them from the people that had them.

Q. Well, did you secure the titles from HOC that you had delivered to them?

A. Yes, except for one that I'm aware of. I don't know of anything else.

Copy of Transcript of 341 Hearing, page 10, attached to plaintiff's *Response to Summary Judgment.*

At another point, the transcript indicates that the debtor was shown a list of vehicles and was asked if he gave each of the persons to whom he sold one of the cars on the list a "valid bill of sale or a certificate of title." To that question, the debtor responded "Except for the '78 Mercedes Roadster." *Id.* at 13.

#### (1) The Mercedes

According to the transcript of the section 341 meeting, the debtor did not make the statement described in paragraph 5 of the plaintiff's original complaint in relation to his sale of the Mercedes. To the contrary, the

debtor admitted in his section 341 meeting testimony that he sold the Mercedes without giving the purchaser a certificate of title. *That testimony therefore cannot form the basis for the denial of the debtor's discharge under paragraph 5 of the original complaint and summary judgment should be granted in favor of the debtor.*

### (2) The Jaguar, Cadillac, Crown Victoria and BMW

The debtor testified in his deposition that, in contravention of his agreement with the plaintiff, he did not deliver the certificates of title to the Jaguar, Cadillac, Crown Victoria, and BMW to the plaintiff but, instead, delivered the certificates of title directly to the persons who purchased the cars from him. Mr. Gould admitted in his deposition testimony that, out of the eight automobiles that are involved in this case, he received certificates of title only to the Subaru and Volkswagen from the debtor.[6] The plaintiff has neither offered proof to contradict the debtor's testimony nor pointed to facts in the record that suggest that the debtor did not deliver valid certificates of title to the purchasers of the Jaguar, Cadillac, Crown Victoria, and BMW. Since, according to the debtor's undisputed testimony, the purchasers of those vehicles received valid certificates of title from him, *the testimony given by the debtor at the section 341 meeting, described in paragraph 5 of the plaintiff's original complaint, was not, as it may relate to the sale of those automobiles, false and cannot form the basis for the denial of the debtor's discharge and summary judgment should be granted in favor of the debtor.*

**6.** Mr. Gould was asked in his deposition: "Did you ever have a title to any of these seven vehicles [excluding the Mercedes] that are listed in your lawsuit?" In response, Mr. Gould stated: "I had a title to the Subaru and to the '84 VW. I had a title to—well, the Mercedes we were talking about. And I had it marked down here on my ledger that I had a title to the '70 Olds, but as I look at that, I see that it's not a title, it's a bill of sale." Copy of deposition of George C. Gould, page 32, attached to debtor's *Motion for Summary Judgment.*

The fact that the plaintiff never received the certificates of title to the Jaguar, Cadillac, Crown Victoria, and BMW from the debtor supports the debtor's testimony that the purchasers of those

### (3) The Oldsmobile

Because the Alabama statutes only require certificates of title for automobiles manufactured after 1974, there is no certificate of title for the Oldsmobile. Consequently, the debtor's statement that he gave valid certificates of title to the purchasers of unspecified automobiles would have no application to the Oldsmobile. In addition, as a merchant involved in the sale of used automobiles, the debtor could, by bill of sale, effectively transfer ownership of the Oldsmobile to a third party purchaser without first procuring the bill of sale originally delivered by him to the plaintiff.[7] The statement by the debtor that he gave a "valid" bill of sale to the purchaser of the Oldsmobile is not, therefore, necessarily false. And, since the plaintiff has not offered proof to contradict the debtor's testimony or pointed to facts in the record which suggest that the debtor did not deliver a "valid" bill of sale to the purchaser of the Oldsmobile, *the Court must conclude that the debtor made no false statement of the nature described in paragraph 5 of the plaintiff's complaint relating to the Oldsmobile and summary judgment should be granted in favor of the debtor.*

### (4) The Subaru

In his deposition, the debtor testified that he paid the plaintiff for the Subaru and was given the title to the automobile by the plaintiff in return and that the Subaru is presently on the car lot where he is employed. The debtor's testimony is bolstered by the fact that Mr. Gould could not produce the certificate of title to the vehicle when asked to do so at his deposition as well as the failure of the plaintiff to produce the certifi-

vehicles received the certificates of titles from him.

**7.** "Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business." Ala. Code 1975, § 7–2–403(2). " 'Entrusting' includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law." Ala.Code 1975, § 7–2–403(3).

cate of title to the vehicle in response to the debtor's motion for summary judgment. Nevertheless, because of the conflict between the debtor's assertion that he paid for the automobile and Mr. Gould's assertion that the debtor has not paid for the automobile, *an issue of material fact remains as to the disposition of the Subaru which precludes summary judgment as to paragraph 5 of the plaintiff's complaint as it relates to that automobile.*

### (5) The Volkswagen

The debtor testified in his deposition that he allowed an employee to use the Volkswagen in return for the employee's promise to pay for the car over time through deductions from his future paychecks. The debtor, according to his deposition, did not obtain a certificate of title or bill of sale from the plaintiff before "selling" the car to the employee. Other than those facts, nothing definitive can be determined regarding the sale of the Volkswagen from the record as it now stands. Mr. Gould testified in his deposition that he has the certificate of title to the automobile but cannot locate it. The debtor's testimony can be interpreted in a manner that could lead to the conclusion that the plaintiff never had a certificate of title to the car. The debtor's testimony can also be interpreted in a manner that could lead to the conclusion that he did not give his employee either a certificate of title or bill of sale for the car. *Because the facts relating to the disposition of the Volkswagen are not apparent from the record and are disputed by the parties, summary judgment is inappropriate as to paragraph 5 of the plaintiff's complaint as it relates to that automobile.*

### (6) Summary as to Paragraph Five of the Original Complaint

In review, summary judgment will be granted in favor of the debtor *as to the allegations contained in Paragraph 5 of the complaint* originally filed in this adversary proceeding as those allegations relate to the Mercedes, Jaguar, Cadillac, Crown Victoria, BMW and Oldsmobile. Summary judgment will, however, be denied as to the same allegations as they relate to the Subaru and the Volkswagen.

### B. Paragraph Seventeen of the Amended Complaint

In paragraph 17 of the amended complaint, the plaintiff contends that the debtor made another false oath when he testified "that the eight identified vehicles were sold with the permission of the Plaintiff," and "that he had secured permission from the Plaintiff to sell each of the eight identified vehicles." In his answer to the plaintiff's complaint, in addition to the language quoted above from paragraph 6 of the answer, the debtor stated:

> Defendant admits that he "willfully and intentionally" sold automobiles in the routine course of his business. Defendant contends that Plaintiff placed automobiles in Defendant's possession for the purpose of such sale. Defendant therefore denies that any sales were "without the consent and permission of the Plaintiff." On the contrary, all sales were with the consent and permission of Plaintiff.

*Answer,* paragraph 3.

The transcript of the testimony given by the debtor at his section 341 first meeting of creditors, a copy of which is attached to the plaintiff's *Response to Summary Judgment,* contains the following question asked by the plaintiff's attorney of the debtor. The question was general in nature, without reference to any particular car. It reads, "Did you sell these cars without their [referring to the plaintiff] permission?" To that question, the debtor responded: "No, they gave me permission to sell the cars." Copy of Transcript of 341 Hearing, page 12, attached to plaintiff's *Response to Summary Judgment* [parenthetical added]. At another point in the meeting, the plaintiff's attorney asked the debtor about the eight cars. He asked, "And is it your testimony that you secured permission from HOC to sell each of those cars that your remember?" The debtor's response was "Yes." *Id.* at 13.

The plaintiff's contention that the debtor made a false oath when the debtor testified that the cars were sold with the permission of the plaintiff and that the debtor had the plaintiff's permission to sell the cars is an unreasonable interpretation of the facts and has no foundation in the record before the

Court. The agreement contemplated that the debtor would display the vehicles on his lot and sell them in the ordinary course of his business. Indeed, the reason the cars were to remain in the debtor's possession under the agreement was so that he could sell them. The fact that the plaintiff expected the debtor to sell the cars is illustrated by Mr. Gould's deposition testimony. That testimony reads in part:

Q. Now at the time that you furnished the money, you HOC, furnished the money for John to acquire the automobiles, you said that you knew that it was his intent to sell those vehicles to the general public, right?

A. Yes.

Q. That was a yes now. I want to be sure that she (court reporter)—she heard that right. That's a yes, right?

A. That he was going to—

Q. That he was going to sell to the general public and to wholesalers too, if he could make a profit?

A. Yes.

Q. And you knew that that was the business that he was in at the time that you let him have the money, selling the automobiles?

A. Yes.

Q. And you had been down there and you knew that he was operating the business, didn't you?

A. Yes.

Q. And that he was operating as a merchant in automobiles, seller of automobiles?

A. Yes.

Q. And you knew that it would be routine for him to sell the automobiles in the routine course of his business?

A. Yes.

Q. Did you ever go down there and see them on display, see the automobiles on display?

A. Certainly.

Q. Did you know at the time that you let him have the money that he was going to place them on display?

A. Yes.

Copy of Deposition of George C. Gould, pages 35–36, attached to debtor's *Motion for Summary Judgment.*

The written agreement between the parties does not specifically require the debtor to obtain prior specific consent for each individual vehicle sale. Furthermore, there is no evidence that the debtor ever orally agreed to obtain prior specific consent for each individual vehicle sale, or that the plaintiff ever directed or requested the debtor to obtain prior specific consent from the plaintiff for each individual vehicle sale. Nothing in Mr. Gould's deposition testimony would suggest that the plaintiff either anticipated or expected the debtor to contact the plaintiff prior to the sale of an individual car for the purpose of obtaining the plaintiff's approval, or otherwise. To the contrary, under the agreement, the plaintiff, according to Mr. Gould's testimony, did not expect to be informed of the sale of an automobile until after the sale when, or if, the debtor delivered the money to exchange for the title. That testimony reads in part:

Q. Well, as a practical matter when you've got a hot prospect you want to sell him right then, don't you?

A. Yeah.

Q. You know that from the insurance business. You don't say just hang on for a few days and I'll be back with you if he's ready to sign, do you?

A. Right.

Q. And if John did that in the routine course of his business he would get the sale made to the customer and get the title later, wouldn't he, from you?

A. Yes.

Q. So that was a routine way of doing business and he had your permission to do that, didn't he?

A. I'm not sure I followed that tract.

Q. All right. I'm a customer. I go in and I want to buy a car from John McAllister. He says sure, sign the application and all that, and we'll get the financing all worked out. I drive off in the car and I've bought the car, right?

A. (The deponent indicated an affirmative response by nodding his head up and down.)

Q. And he sold it to me with your permission in that illustration, didn't he?

A. Yes.

Q. Then he takes the contract to the bank, collects his money, puts the money in the bank. Comes to you and says, look, I've sold this one, I need to pay you off, right?

A. Yes.

Q. I need the title so I can send it in with the paperwork and that sort of thing.

A. Right.

Q. And then he writes you a check, takes the title to the bank or lending institution and they finish the paper work?

A. Right.

Q. But the actual sale to the customer was with your permission. The part that was not with your permission was his failure to get the title back from you, right?

A. Yes.

Copy of Deposition of George Gould, pages 52–54, attached to debtor's *Motion for Summary Judgment.*

The debtor, according to Mr. Gould, had authority from the plaintiff to sell the vehicles purchased with money supplied by the plaintiff. Furthermore, Mr. Gould acknowledged that sales of automobiles by the debtor were accomplished with the plaintiff's "permission" even though the plaintiff was not notified of the sales before the sales had taken place. The debtor's first meeting of creditors' statements to the effect that he sold the cars with the plaintiff's permission were not, therefore, false and, consequently, *summary judgment must be granted for the debtor as to the allegations contained in paragraph 17 of the amended complaint.*

### C. Paragraph Eighteen of the Amended Complaint

#### (1) Question 11 of the Statement of Affairs

In paragraph 18 of the amended complaint, the plaintiff contends that the response made by the debtor to question 11 in his bankruptcy petition statement of affairs was false.

Question 11 asks the debtor to "List all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were closed, sold, or otherwise transferred within one year immediately preceding the commencement of this case." In response to Question 11 the debtor marked the block which says "None" with an "X." The plaintiff contends that the response is incomplete in that it "fail[s] to disclose the closed financial account. . . ." *Amended Complaint,* Paragraph 18.

The only portion of the debtor's answer which is applicable to the allegation made in paragraph 18 of the plaintiff's amended complaint is the general denial contained in paragraph 9 which states: "To the extent not already admitted, Defendant denies the remaining material averments of the complaint and demands strict proof thereof." *Answer,* Paragraph 9. In the memorandum of law filed by the debtor in support of his summary judgment motion, the debtor responds to the plaintiff's allegation. The memorandum reads in part:

Paragraph 18 alleges that as a part of the original petition, the debtor stated that he had closed no financial accounts within one year. This obviously refers to bank accounts. The debtor closed no such accounts.

*Memorandum of Law in Support of Motion for Summary Judgment.*

The statement, contained in the memorandum filed by the debtor's attorney, that no financial accounts have been closed by the debtor within the year preceding bankruptcy is not supported either by affidavit or any of the testimony that has been submitted in connection with the summary judgment motion. The debtor's deposition contains only the following brief reference to bank accounts. It reads:

Q. Did you have a checking account—

A. Yes.

Q. —on Distinctive Motors? Do you still have a checking account?

A. No.

Q. Where was the checking account?

A. First Commercial.

Q. Did you have it for the last two years before you filed your bankruptcy petition?

A. Yes.

Copy of Deposition of John R. McAllister, pages 11–12, attached to plaintiff's *Response to Motion for Sanctions.*

At the debtor's first meeting of creditors, the debtor was also questioned briefly about his bank accounts and gave the following testimony on the subject. He stated:

Q. What banks did you deal with?

A. I banked with Compass Bank and First Commercial Bank.

Q. And what were those account names? What was the names of the account?

A. Distinctive Motor Cars.

Q. On both accounts?

A. Uh-huh. And I had a personal checking account, John R. McAllister. And we had P.J.'s Pawn account at New Federal Savings and that was it.

Copy of Transcript of 341 Hearing, pages 15–16, attached to plaintiff's *Response to Summary Judgment.*

As is apparent from the quoted excerpts, the debtor did not testify in either his deposition or at his section 341 meeting of creditors that he did not close any bank accounts within the year preceding bankruptcy. In addition, no portion of the record before the Court supports an inference that the debtor did not knowingly and fraudulently give a false answer to question 11 in his statement of affairs. The debtor has, therefore, as to that portion of the complaint, failed under the standards enunciated in *Fitzpatrick,* to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file which he believes demonstrates the absence of a genuine issue of material fact. Consequently, *summary judgment must be denied as to the allegations contained in paragraph 18 of the plaintiff's complaint relating to the alleged false oath made by the debtor about his bank accounts.*

### (2) Question 16 of the Statement of Affairs

Also, in paragraph 18 of the amended complaint, the plaintiff contends that the re-

sponse made by debtor to question 16 in the statement of affairs was false. Question 16 asks the debtor to "list the names and addresses of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partnership, sole proprietorship, or was a self-employed professional within two years immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within the two years immediately preceding the commencement of the case." In response to Question 16, the debtor listed Distinctive Motor Cars, the name under which he conducted business with the plaintiff and "P.J.'s Pawn, Inc." The plaintiff contends that the debtor's response was incomplete in that he "failed to disclose business transactions with Dollar Rent–A–Car, Dr. William Taylor, KO Investments, and Keith Barker." Amended Complaint, Paragraph 18.

Again, the only portion of the debtor's answer which is applicable to those allegations is the general denial contained in paragraph 9. However, the debtor states the following in the memorandum of law filed in support of his summary judgment motion. That memorandum reads in part:

Paragraph 18b accuses the Defendant of stating that he had "only been in business with" one company. Plaintiff then equates borrowing money in the routine course of business as being "in business with" that company.

*Memorandum of Law in Support of Motion for Summary Judgment.*

[ ] The evidence before the Court demonstrates that the debtor operated only two businesses during the two year period before bankruptcy. These were Distinctive Motor Cars and P.J. Pawn, Inc. These businesses operated out of the same location and shared common facilities, furnishings, equipment, and employees. Dollar Rent–A–Car, Dr. William Taylor, KO Investments, and Keith Barker each *did business with* Distinctive Motor Cars, the same way that the plaintiff did business with Distinctive Motor Cars, by loaning money for the debtor to purchase used automobiles for resale. Neither the plaintiff nor Dollar Rent–A–Car, Dr.

William Taylor, KO Investments, or Keith Barker has otherwise ever been *in business with* or been a business partner of the debtor in any sense. They are all creditors of the debtor, doing business as Distinctive Motor Cars, and nothing more.

Question 16 of the statement of affairs does not ask for the information that the plaintiff contends should have been supplied by the debtor in response to that question. Question 16 plainly asks a debtor to provide the name and address of any business operated as either a corporation, partnership or sole proprietor during the two years preceding bankruptcy. It does *not* ask a debtor to describe who he or she *did business with* during the same two year period.[8] Therefore, the debtor's failure to list Dollar Rent–A–Car, Dr. William Taylor, KO Investments, and Keith Barker specifically in response to Question 16, was appropriate and cannot be a "false oath" under 11 U.S.C. § 727(a)(4)(A) and *summary judgment must be granted as to that allegation.*[9]

## V. FITZPATRICK REVISITED

### A. Issues as to Which Summary Judgment is Improper

Genuine issues of material fact preclude summary judgment as to the following portions of the plaintiff's complaint:

8. A construction of Question 16 that would require a merchant debtor to list all entities with whom he or she did business would, in essence, require a listing of all of that debtor's customers and creditors and would, in part, be redundant of the schedules of creditors that are otherwise required to be provided by a debtor with his bankruptcy petition. The expansive construction of Question 16 encouraged by the plaintiff is not authorized by the plain language of the question.

Nor is the information which the plaintiff contends is required by Question 16 generally essential to bankruptcy administration. The purpose of the official forms is to provide basic information regarding a debtor's assets, liabilities and financial affairs. They are not intended to be made a comprehensive record or journal of the debtor's business dealings. If it were otherwise, the petition filed by even a modest business person would be extensive. The first meeting of creditors and Bankruptcy Rule 2004 provide the means and opportunity for trustees and creditors to obtain information not strictly required by the official bankruptcy forms. Indeed, it appears that the debtor was questioned extensively about dealings with Dollar Rent–A–Car, Dr. William

1. Those portions of the plaintiff's original and amended complaints which are based on 11 U.S.C. § 523 and allege fraud, embezzlement and conversion.

2. The allegations based on 11 U.S.C. § 727 which are contained in paragraph 5 of the plaintiff's original complaint as they relate to the Subaru and the Volkswagen.

3. That portion of paragraph 18 of the plaintiff's amended complaint which is based on 11 U.S.C. § 727 and alleges a false oath by the debtor in his statement of affairs regarding bank accounts closed by him within in a year of bankruptcy.

Relative to those portions of the plaintiff's complaint, the pleadings, depositions, exhibits, and memorandum submitted by the parties do not show an absence of evidence to support the plaintiff's case or that the plaintiff will be unable to prove a case at trial. The debtor's motion for summary judgment must, therefor, be denied, to the extent it relates to those portions of the plaintiff's complaint.

### B. Issues as to Which Summary Judgment is Proper

Summary judgment is proper as to the following portions of the plaintiff's complaint:

Taylor, KO Investments, and Keith Barker at the 341 hearing and in his deposition as well.

9. Furthermore, much of the information that the plaintiff contends should have been supplied by the debtor was, in fact, supplied by the debtor, albeit in another part of his bankruptcy petition. Dr. William Taylor, KO Investments, and Keith Barker were each appropriately listed by the debtor in Schedule F attached to his bankruptcy petition, entitled "Creditors Holding Unsecured Nonpriority Claims."

And, finally, the plaintiff has pointed to no fact in the record which might suggest that the debtor acted "knowingly and fraudulently" by not listing the names and addresses of Dollar Rent–A–Car, Dr. William Taylor, KO Investments, and Keith Barker specifically in response to Question 16. To the contrary, the fact that much of the same information was provided by the debtor elsewhere in his bankruptcy petition, when coupled with the fact that the debtor testified extensively about his relationship with those entities at his 341 meeting, strongly mitigates against any inference that the debtor was trying to hide his relationship with those entities from either the trustee or his creditors.

1. The allegations based on 11 U.S.C. § 727 which are contained in paragraph 5 of the plaintiff's original complaint as they relate to the Mercedes, Jaguar, Cadillac, Crown Victoria, BMW and Oldsmobile.

2. The allegations based on 11 U.S.C. § 727 which are contained in paragraph 17 of the plaintiff's amended complaint.

3. That portion of paragraph 18 of the plaintiff's amended complaint which is based on 11 U.S.C. § 727 and alleges a false oath by the debtor in his statement of affairs regarding the businesses operated by him within two years preceding bankruptcy.

The debtor, as to those portions of the plaintiff's complaint, has informed the Court of the basis for his summary judgment motion and has identified those portions of the pleadings, depositions, exhibits, and memorandum submitted by the parties which demonstrate the absence of a genuine issue of material fact. The debtor has not only demonstrated to the Court that there is an absence of evidence to support the plaintiff's case, but has also supported his motion with credible evidence, primarily the testimony contained in his deposition and the testimony of Mr. Gould, that would entitle him to a directed verdict if not controverted at trial.

The initial burden under *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993) was satisfied by the debtor. The responsibility then fell on the plaintiff to show the existence of a genuine issue as to the material facts relative to those portions of its complaint. The plaintiff, however, has not shown or presented evidence sufficient to call into question the inferences created by the debtor's evidence on any particular material fact. Furthermore, the plaintiff has not presented evidence sufficient to withstand a directed verdict motion at trial on the material facts negated by the debtor's evidence; or shown that the record in this case in fact contains evidence which supports its case, sufficient to withstand a directed verdict motion, which was overlooked or ignored by the debtor; or presented additional evidence sufficient to withstand a directed verdict motion at trial based on the evidentiary deficiency pointed out by the debtor. The plaintiff has, in short, not come forward with significant, probative evidence demonstrating the existence of a triable issue of fact and the combined body of evidence presented by the two parties relevant to the material facts is such that the debtor would be entitled to a directed verdict at trial as to those portions of the plaintiff's complaint.

The Court has considered all pleadings, depositions, exhibits, and memorandum submitted by the parties. Furthermore, the Court has resolved all reasonable doubts about the facts contained in those documents in favor of the plaintiff, and drawn all justifiable inferences from the facts contained in those documents in the plaintiff's favor. Nevertheless, the Court finds that, as to the above portions of the plaintiff's complaint, there are no genuine issues as to any material facts and that the debtor is entitled, under Fed.R.Civ.P. 56(c), to judgment as a matter of law.

## VI. CONCLUSION

A separate order will be entered in accordance with this memorandum opinion.

## ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In conformity with and pursuant to the Memorandum Opinion entered contemporaneously herewith, it is **ORDERED, ADJUDGED AND DECREED** that:

1. The defendant's *Motion for Summary judgment* is denied as to the following portions of the plaintiff's complaint:

a. Those portions of the plaintiff's original and amended complaints which are based on 11 U.S.C. § 523 and allege fraud, embezzlement and conversion.

b. The allegations based on 11 U.S.C. § 727 which are contained in paragraph 5 of the plaintiff's original complaint as they relate to the Subaru and the Volkswagen.

c. That portion of paragraph 18 of the plaintiff's amended complaint which is based on 11 U.S.C. § 727 and alleges a false oath by the debtor in his statement of

affairs regarding bank accounts closed by him within a year of bankruptcy.

2. The defendant's *Motion for Summary judgment* is granted as to the following portions of the plaintiff's complaint:

a. The allegations based on 11 U.S.C. § 727 which are contained in paragraph 5 of the plaintiff's original complaint as they relate to the Mercedes, Jaguar, Cadillac, Crown Victoria, BMW and Oldsmobile.

b. The allegations based on 11 U.S.C. § 727 which are contained in paragraph 17 of the plaintiff's amended complaint.

c. That portion of paragraph 18 of the plaintiff's amended complaint which is based on 11 U.S.C. § 727 and alleges a false oath by the debtor in his statement of affairs regarding the businesses operated by him within two years preceding bankruptcy.

